O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| IN RE: MEDICAL CAPITAL SECURITIES LITIGATION- *In re MedCap* | Lead Case: SA ML 10-2145 DOC (RNBx) |
| This order relates to | |
| SA CV 09-1048 DOC (RNBx) - *Masonek* | ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT WELLS FARGO'S MOTION FOR SUMMARY JUDGMENT, AND GRANTING IN PART AND DENYING IN PART PLAINTIFF NOTEHOLDERS' MOTION FOR PARTIAL SUMMARY JUDGMENT |
| SA CV 10-0548 DOC (RNBx) - *Bain* | |
| CV 10-6561 DOC (RNBx) - *Abbate* | |
| SA CV 09-0818 DOC (RNBx) – *SEC* | |

Before the Court are Motions for Summary Judgment (or partial summary judgment) brought in three actions: *Masonek et al. v. Wells Fargo et al.*, SA CV 09-1048 DOC (RNB) ("*Masonek*"); *Bain et al., v. Wells Fargo et al.*, SA CV 10-0548 DOC (RNB) ("*Bain*"); and *Abbate et al., v. Wells Fargo et al.*, SA CV 10-6561 DOC (RNB) ("*Abbate*"). Defendant Wells

Fargo Bank, N.A. ("Wells Fargo") and Plaintiffs ("Plaintiffs," "Noteholders," or "Plaintiff Noteholders") have brought Motions for Summary Judgment. Wells Fargo seeks summary judgment on all issues or, in the alternative, partial summary judgment. WF Mot. 1 (Dkt. 443). Plaintiffs seek partial summary judgment on their status as third-party beneficiaries to the Note Issuance and Security Agreements ("NISAs"), on certain breaches by Wells Fargo as trustee, and on certain breaches by Medical Capital. Pls.' Mot. 1 (Dkt. 442). A third Motion for Summary Judgment (Dkt. 455), brought by Plaintiffs on affirmative defenses asserted by Wells Fargo, is moot because Wells Fargo withdrew all those defenses at oral argument.

After considering the moving, opposing, and replying papers, as well as oral argument, the Court GRANTS in part and DENIES in part both Motions, as discussed in detail below.

## I.    Background

This action stems from an alleged securities fraud in the offer and sale of securities in the form of notes issued by Medical Capital Holdings, Inc.; Medical Capital Corporation; Medical Provider Funding Corporations; Sydney Field; and Joseph Lampariello (collectively, referred to as "Medical Capital" or "MedCap"). *See Sec. and Exch. Comm. v. Medical Capital Holdings, Inc., et al.* ("*SEC*"), Case No. SACV 09-0818 DOC (RNBx) (filed July 16, 2009).

The background facts to this alleged Ponzi scheme are well known to the parties and to this Court from more than three years of litigation. Readers are directed to the Order Granting Motion To Dismiss (Dkt. 53, *In re MedCap*) and Order Granting Plaintiffs' Motion For Class Certification (Dkt. 240, *In re MedCap*), and any of the Receiver's reports, posted online at www.medicalcapitalreceivership.com, for a fuller account.[1]

---

[1] In an Order on the issue of standing for this lawsuit, the Court provided the following short background summary:

> Each NISA provided that Noteholders would receive a Note in return for their investment. The Note then provided that each Noteholder would get back the principal invested, and that payment would happen on a particular date. It also provided that the Noteholder would be paid interest on a regular schedule, at a specific interest rate.

As relevant here, Plaintiffs brought the underlying actions (*Bain*, *Abbate*, and *Masonek*) on behalf of persons or entities who purchased or otherwise acquired interests in notes ("Notes") issued by Medical Provider Funding Corporation III.1 ("MP III.1"), Medical Provider Funding Corporation III.2 ("MP III.2") and Medical Provider Funding Corporation V ("MP V") (collectively referred to as Special Purpose Corporations ("SPCs")).[2] Defendant Wells Fargo served as a trustee for these three SPCs.[3] Wells Fargo's Statement of Genuine Disputes of Material Fact and Additional Facts in Opposition to Plaintiffs' Motion for Partial Summary Judgment 1-2 ("WF Opp'n SUF"). These relationships were governed by NISAs for each SPC, and each NISA was, unless noted below, substantially similar for each SPC.[4] Wells Fargo entered into each NISA with each SPC, "for the equal and ratable benefit of the Noteholders."

---

Starting in August 2008, each Special Purpose Corporation began to default on paying interest, principal, or both, to Noteholders. Through July 2009, none of the Special Purpose Corporations had cured those defaults.

After the Securities and Exchange Commission (SEC) sued the MedCap companies and its officers in July 2009, this Court entered an Order granting a preliminary injunction and appointing Thomas Seaman as the permanent receiver for Medical Capital Holdings, Inc., Medical Capital Corporation [the Administrator for the SPCs and under the NISAs], and each of the Special Purpose Corporations . . . Plaintiff Noteholders began filing lawsuits against various non-MedCap parties, including what became the *Masonek* class action against Wells Fargo and Bank of New York Mellon. *Masonek* plaintiffs filed the first version of their lawsuit in September 2009, and *Abbate* and *Bain* followed in 2010. All three lawsuits came to allege that Plaintiff Noteholders were intended third-party beneficiaries of the NISAs and that Wells Fargo and Bank of New York Mellon injured Plaintiff Noteholders by breaching the requirements of the NISAs, which then led the Special Purpose Corporations to default on payments of principal and interest due.

Order Denying Wells Fargo's Motion for Summary Judgment Re: Standing 4-5 (*In re MedCap*, Dkt. 438) (citations omitted).

[2] This action previously also involved the SPCs MP II, MP IV, and MP VI. Bank of New York Mellon, the indentured trustee for those three SPCs, reached a settlement with the Noteholders.

[3] Wells Fargo entered into a Supplemental NISA with MP III for a second series of notes offered by that SPC. The first series in MP III was MP III.1, the second series was MP III.2. The NISA for MP III.1 applied to MP III.2, except as modified by that First Supplemental NISA.

[4] Unless otherwise indicated, citation or references to an NISA provision, e.g. "NISA Section 5.08," indicates that the provision is identical in each NISA. *See* MP III.1 NISA, MP III.2 NISA, MP V NISA, Furukawa Decl. Exs. 1–3, Dkt. 460.

*Id.* 4. As is relevant to Plaintiffs' allegations, Wells Fargo had three areas of duties under the NISAs: (1) administering the Trust Account;[5] (2) receiving and examining certificates;[6] and (3) acting if Medical Capital defaulted on any of its obligations. One of the key tasks for the Trustee was to disburse money so that Medical Capital could buy Receivables, meaning medical accounts receivable that Medical Capital would try to collect on, and Non-Receivables, which, beyond simply being investments that were not in the category of Receivables, had to be related to the healthcare industry. *See* NISA Section 5.08(a)(ii)(E); Art. I (defining terms).

In the event the Debtor (the SPC) did not meet its obligations, various provisions, discussed below, governed a trustee's appropriate steps. An Event of Default, a technical term, expanded the Trustee's duties to require it, post-Event of Default, to act as a "prudent person." NISA Section 5.06(a)(iii). This Event of Default could happen, as relevant here, if (1) the Debtor failed to pay Noteholders principal or interest and that default continued for 15 days; (2) if the Debtor provided a certificate or determination that was "false or misleading as of the date made in any material respect, and which within 30 days of notice by the Trustee, the Debtor fail[ed] to cure such inaccuracy;" or (3) if the Debtor materially breached any other provision of the NISA and such breach continued unremedied for 30 days after receiving notice from the Trustee. NISA Section 6.01(a)-(c).

Plaintiffs assert one claim for breach of contract, but that claim comprises many different asserted breaches of the NISAs. Sixty-three allegations of breach are set forth in Wells Fargo's

---

[5] *See, e.g.*, NISA Section 5.06. Subsection (a)(i) noted that except when an Event of Default, a technical term, occurred and continued, and an Officer in the Corporate Trust Department had actual knowledge, the Trustee "undertakes to perform such duties and only such duties as are specifically set forth in this Note Agreement and the Transaction Documents to which it is a party, and no implied covenants or obligations shall be read into this Note Agreement against the Trustee."

[6] NISA Section 5.06 (ii) provided that "In the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Note Agreement." In the case of "any such certificates or opinions which by any provisions hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they *conform as to form with the requirements of this Note Agreement* and *whether* or not *they contain the statements required under this Note Agreement* (emphasis added).

Reply Statement of Undisputed Facts and Responses to Additional Facts ISO Summary Judgment ("WF RUF") 4-67, and those are not the entirety of all alleged breaches. The Court will discuss specific breaches, or categories of breaches, and other facts below as relevant to each section of the Order. The alleged breaches can be grouped into categories that include those: predicated on failing to declare an Event of Default, *see, e.g.*, *id.* 35; predicated on failing to notice that an Event of Default actually occurred, *see, e.g.*, *id.* 59; based on disbursing funds with inaccurate, incomplete, or missing documentation, *see, e.g.*, *id.* 5; and based on miscellaneous provisions that Wells Fargo is accused of violating, *see, e.g. id.* 159.

Contractual provisions that set the standards for liability shall be discussed below, but are briefly summarized here. First, Section 5.06(j) of the NISAs provided that "The Trustee shall not be liable for any action it takes or omits to take in good faith which it believes to be authorized or within its rights or powers . . . that . . . does not constitute willful misconduct, negligence, or bad faith." Section 5.06(i) states that Wells Fargo "undertakes to perform such duties and only such duties as are specifically set forth" in the indenture agreement and "no implied covenants or obligations shall be read into this Note Agreement against [Wells Fargo]." And Section 5.06(a)(ii) provides that, "[i]n the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements" of the NISA. Where a NISA Section specifically required that a certificate or opinion be given to the Trustee, the Trustee had a duty to examine it to determine if it conformed to the form required and the statements required by the NISA. *Id.*

## I. Legal Standard

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is to be granted cautiously, with due respect for a party's right to have its factually grounded claims and defenses tried to a jury. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The court must

view the facts and draw inferences in the manner most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1992); *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1161 (9th Cir. 1992). When a court finds part of a contract to be ambiguous, it ordinarily should be "hesitant to grant summary judgment 'because differing views of the intent of parties will raise genuine issues of material fact.'" *San Diego Gas & Elec. Co. v. Canadian Hunter Mktg. Ltd.*, 132 F.3d 1303, 1307 (9th Cir. 1997) (quoting *Maffei v. Northern Ins. Co.,* 12 F.3d 892, 898 (9th Cir.1993). With a contract ambiguity, the court should determine whether the ambiguity could be resolved consistent with the non-moving party's contention. *Id.* If so, summary judgment should be denied. *Id.* In such an analysis the court must, of course, construe evidence in the non-moving party's favor, and draw all reasonable inferences in that same manner. *Id.*

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact for trial, but it need not disprove the other party's case. *Celotex*, 477 U.S. at 323. When the non-moving party bears the burden of proving the claim or defense, the moving party can meet its burden by pointing out that the non-moving party has failed to present any genuine issue of material fact as to an essential element of its case. *See Musick v. Burke*, 913 F.2d 1390, 1394 (9th Cir. 1990).

Once the moving party meets its burden, the burden shifts to the opposing party to set out specific material facts showing a genuine issue for trial. *See Liberty Lobby*, 477 U.S. at 248-49. A "material fact" is one which "might affect the outcome of the suit under the governing law . . . ." *Id.* at 248. A party cannot create a genuine issue of material fact simply by making assertions in its legal papers. *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co., Inc.*, 690 F.2d 1235, 1238 (9th Cir. 1982). Rather, there must be specific, admissible evidence identifying the basis for the dispute. *Id.* The court need not "comb the record" looking for other evidence; it is only required to consider evidence set forth in the moving and opposing papers and the portions of the record cited therein. Fed. R. Civ. P. 56(c)(3); *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001). The Supreme Court has held that "[t]he mere

-6-

existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for [the opposing party]." *Liberty Lobby*, 477 U.S. at 252.

Rule 56(a), expressly allows a party to seek summary judgment on "part of" a "claim or defense." Here, for example, Plaintiffs seek partial summary judgment as to certain breaches, as well as their status as third-party beneficiaries.

## II. Analysis — Wells Fargo's Motion for Summary Judgment

The Court will consider each issue up for summary judgment in turn, starting with Wells Fargo's Motion. At the outset, the Court notes Wells Fargo's repeated argument that, even if it was incorrect in its interpretations of the contract, it is protected by the contractual standard of duty, which often only allowed for liability if Wells Fargo was at least negligent. *See, e.g.*, WF Mot. 12, 22, 23, 24.[7] Plaintiffs have evidence that Wells Fargo employees in charge of making the disbursements lacked any familiarity with the requirements of the NISAs, and did not recall any training on the subject. Pls.' Statement of Uncontroverted Facts in Opposition to Summary Judgment ("Pls.' Opp'n SUF") 106-107. Since elements of breach, including good faith, are ordinarily jury questions, *Brown v. Grimes*, 192 Cal. App. 4th 265, 278 (2011); *Hicks v. E.T. Legg & Associates*, 89 Cal. App. 4th 496, 509 (2001), the Court finds the same is generally true here where negligence is an issue.

### a. Wells Fargo's Motion for Summary Judgment Related to Events of Default

Wells Fargo argues that it cannot be liable for certain alleged breaches based on a failure of SPCs to submit compliance documents. Plaintiffs allege these particular breaches based on the theory that those failures by the SPCs did eventually trigger Events of Default, or should have under 6.01(b) and (c) of the NISAs, and thus Wells Fargo breached both sections. WF RUF 80.  Those breaches included failing to then act as a prudent person, as required after an Event of Default, and by failing to give notice to Plaintiffs in response.

---

[7] Where liability requires at least "bad faith," the Court will note the different standard.

Under the NISAs, either of the following would count as an Event of Default which would, among other things, trigger a requirement for the higher, prudent person standard of care from the trustee:

> • [a]ny certificate or determination of the Debtor furnished hereunder . . . was false or misleading as of the date made in any material respect and which, within 30 days of notice by the Trustee, the debtor fails to cure such inaccuracy; and
>
> • Debtor materially breaches any other covenant or provision of this Note Agreement with respect to the Notes [in the respective Series that a particular NISA governed] and such breach continues unremedied for a period of 30 days after receipt of a notice from . . . the Trustee.

*Id.* 81-85. A key dispute here is what constitutes notice. Section 9.03(a) of the NISAs provides that "[a]ny notice hereunder shall be in writing and shall be personally delivered or transmitted by facsimile, postage prepaid registered mail, return receipt requested, or overnight delivery service." *Id.* 86.

There are three arguments in Wells Fargo's Motion regarding Sections 6.01(b) and (c): (1) there was never an Event of Default that Wells Fargo failed to declare because a condition precedent—specifically, notice to the SPC complying with the formal requirements of 9.03—never occurred; and, separately, Wells Fargo did not have a duty to send such a notice; (2) there can be no material breach on the basis that documents were submitted late, as the Court's prior rulings have held that lateness is not a material breach; (3) that any alleged breach by Wells Fargo is not the cause-in-fact of Plaintiffs' losses. The Court shall consider each argument in turn.

//

//

-8-

### i. Summary Judgment is Inappropriate for the Argument that Wells Fargo Had no Duty to Give Notice, but is Appropriate on the Argument that E-mail could not Serve as Notice

Here the key is how broadly one reads *In re Bankers Trust Co.* (hereafter *Bankers Trust*), 450 F.3d 121 (2d Cir. 2006). In that case, a bank served as indenture trustee for notes that a company issued. *Id.* at 122. Noteholders sued after the company's bankruptcy, alleging, among other claims, breach of contract by the trustee. *Id.* The Second Circuit found that because the bank had a duty to examine certificates, "its failure to do so cannot excuse its failure to comply with the duty . . . to take action with respect to known defaults." *Id.* at 127. The court cited an opinion by Judge Friendly for the broader proposition that

> [o]ne who unjustly prevents the performance of the happening of a condition of his own promissory duty thereby eliminates it as such a condition. *He will not be permitted to take advantage of his own wrong*, and to escape from liability for not rendering his promised performance by preventing the happening of the condition on which it was promised.

*Id.* (quoting *Spanos v. Skouras Theatres Corp.*, 364 F.2d 161, 169 (2d Cir. 1966) (en banc) (emphasis added)).[8] The court went on to clarify that the principle from *Spanos* applies to inaction by a trustee. *Id.* at 128.

This Court previously read *Bankers Trust* to allow a claim of breach based on default to survive a Motion to Dismiss, Second *Abbate* Order 9-10 (Dkt. 227). This Court held that a trustee could not escape liability for not declaring an Event of Default based on the trustee's decision not to notify Medical Capital of a material breach, *id.*, assuming missing or inaccurate documents were material. The evidence at the summary judgment stage shows that a wide range of documents were missing at times, often for months, and that certain documents that were supposed to be provided to Wells Fargo were, if factual inferences are drawn in Plaintiffs' favor, never provided in the form required. Noteholders Plaintiffs' Joint Statement of Uncontroverted

---

[8] Judge Friendly was in turn quoting 3A *Corbin on Contracts* Section 767, at 540 (1960).

Facts and Conclusions of Law ISO Motion for Partial Summary Judgment 64, 65, 70, 71, 74 (Dkt. 459) ("Pls.' Mot. SUF").[9]

Wells Fargo argues that no implied covenants or obligations can be read into the NISAs against the Trustee, under Section 5.06(a)(i) of each NISA. WF Mot. 10. But here, under Wells Fargo's reading, the bank would be close to the master of its own liability, able to insulate itself against even negligence simply by never lifting a finger to notify the SPCs of a breach that needs to be cured. This is an interpretation that a jury could find for Wells Fargo, but it is also one that reasonable jurors could disagree on, as they seek to interpret the intent behind a contract term that is ambiguous. *See FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285 (7th Cir. 2002) (explaining that interpretations of contract clauses that would seem to frustrate the point of the contract are disfavored because "people are unlikely to make contracts . . . that they believe will have absurd consequences") (citations omitted).

In its Reply, Wells Fargo points to prior Court Orders from a different context, when the Court granted Motions to Dismiss Plaintiffs' cause of action that alleged a breach of the implied covenant of good faith and fair dealing. WF Reply 3 n.8 (citing Second *Abbate* Order 13-14 (Dkt. 227); First *Abbate* Order 8 (Dkt. 196)). But those Orders simply held that, under relevant state law, Plaintiffs did not have an implied covenant cause of action separate from the breach claim—the breach claim stood alone, as interpreted under the NISA contracts.

A stronger counterargument is that *Bankers Trust* should be read more narrowly. In that case, arguably two obligations were relevant: the trustee had to examine certain documents to see if they conformed to the requirements—as the trustee did for MedCap—and then the *Bankers Trust* trustee owed a duty, under the specific contract, to give indenture security holders "notice of all defaults known to the trustee, within ninety days" of those defaults. *Bankers Trust*,

---

[9] For example, Wells Fargo's Cheryl Zimmerman, the Wells Fargo Vice President who worked on the MedCap accounts, wrote in an e-mail in 2009 that "The Agreement states the Debtor shall provide a written certification of the Net Collateral Coverage Ratio," and notes that "We have not received a written certification in the past." WF RUF 70.

-10-

450 F.3d at 126. This notice obligation was to "all defaults" (lowercase d), a broader term than an Event of Default, as the district court in that case had noted. *See Semi-Tech Litig., LLC v. Bankers Trust Co.*, 353 F. Supp. 2d 460, 479 (S.D.N.Y. 2005). This meant that the trustee had to report events that *would* become an Event of Default. *Id.* By contrast, Wells Fargo argues that it has no such duty of subsequent notice for any "lowercase d default." WF Reply 2 n.6. But the duty that the Second Circuit identified as having made the difference, and triggering the principle from *Spanos* (that one "will not be permitted to take advantage of his own wrong"), was the first duty, the duty to inspect certificates to make sure they were received and conformed to form. *See Bankers Trust*, 450 F.3d at 128-29 (distinguishing a prior case in conflict with *Spanos* by noting *Bankers Trust* differed because the trustee had a "duty to examine the certificates furnished . . . to determine whether they conformed to the requirements of the indenture.")

In sum, the Court is not persuaded that an absurd result is commanded by Sections 6.01(b) and (c). Such a reading would also seem to thwart the command of Section 6.02, that once the Trustee knows of an Event of Default, "the Trustee *shall* give notice" to Noteholders. If the Trustee need not ever notify the SPCs, then simply through inaction he can prevent any benefit of Section 6.02's requirement of notice to Noteholders of an Event of Default. Nor does the Court find that Wells Fargo's course of conduct, in which formal notices issued after informal follow-up pursuant a computerized "tickler system" for tracking compliance documents, WF RUF 94, lays this issue to rest in favor of an interpretation that Wells Fargo never had to issue a formal notice to the SPCs, and thus cannot be liable for failing to issue a notice. *See, e.g., Shawmut Bank v. Kress Assoc.*, 33 F.3d 1477, 1494 n.14 (9th Cir. 1994) (finding that a course of dealing argument created a dispute of fact, but did not lay one to rest). In a contract that exists for the "equal and ratable benefit of the noteholders," this assessment of what the contracting parties intended should be resolved by a jury. The Court DENIES summary judgment for Wells Fargo's claim that alleged failures to declare an Event of Default cannot be a breach because Wells Fargo never had an obligation to issue notice.

-11-

One final aspect of Wells Fargo's argument does remain, and summary judgment shall be GRANTED in Wells Fargo's favor on this limited aspect. Plaintiffs assert that Events of Default *actually happened* when MedCap failed to provide compliance documents within 30 days of an e-mail request for those documents. *See* Pls.' Opp'n 8 n.5. By this theory, Wells Fargo would be liable if it did not act by the heightened, prudent person standard. That theory of breach is foreclosed as a matter of contract interpretation. The clear language of NISA Section 9.03 states that "any notice hereunder shall be in writing and shall be personally delivered or transmitted by facsimile, postage prepaid registered mail, return receipt requested, or overnight delivery service." WF RUF 86. The section provides "the following address[es]" for MedCap and Wells Fargo, which consist of mailing addresses, phone numbers, and fax numbers, but no e-mail address. Thus, an e-mail cannot serve as the formal notice required under the NISAs.

Plaintiffs note that a later paragraph in the Section, one referring to "[a]ll notices and other communications," establishes the agreed-upon delivery dates for different forms of communication, including "telecopy, telex, telegram, or cable." Plaintiffs argue that e-mail is simply a modern form that should be understood to satisfy the notice requirement. Pls.' Opp'n 8 n.5. But this section on delivery dates refers to "notices *and other communications*" (emphasis added) and thus it is not inconsistent with the prior clear definition of what constituted notice. Even if the Court were inclined to go outside the clear terms of the contract, it was clear at oral argument that the course of conduct between Wells Fargo and the SPCs was not one in which e-mail was understood by either party to count as formal notice. Thus, the Court GRANTS Summary Judgment in Well Fargo's favor against any allegation that Events of Default actually occurred when Wells Fargo sent an e-mail requesting a compliance document and the SPC failed to cure within thirty days.

To be clear, Plaintiffs claims survive to the extent they contend that Wells Fargo *should* have sent a notice for an alleged violation of Sections 6.01(b) and (c). This brings the Court to Wells Fargo's materiality argument, and what could constitute a material breach that would justify a Notice of Event of Default under Section 6.01(c).

### ii.   Certain Breaches Alleged are Foreclosed Because the Fact Compliance Documents are Late, Standing Alone, does not Create a Material Breach

This Court has held that a breach from a late-filed document was not material, because tardiness does not go to the essence of the agreement to threaten the aggrieved party with the possibility of being deprived of the benefit of the contract. Second *Masonek* Order on Motion to Dismiss 11 (Dkt. 143, *In re MedCap*) (citing, among other authorities, *Semi-Tech*, 353 F. Supp. 2d at 485). Parties are free to write a contract that makes time the essence of the contract, but a court will not presume this to be the case. *Cushing v. Levi*, 117 Cal. App. 94, 105 (1931). In a later order, the Second *Abbate* Order at 9, the Court held that failure altogether to submit compliance documents may be material and that the "unreported absence of financial documents may very well be material." These holdings can be summarized as stating that lateness alone is not per se material, but that at some point, a late document may become a material breach because an indenture trustee can no longer expect to receive it. This could be because the debtor refuses to deliver the document, *see* WF RUF 67, or because so many documents have been missing for such a long period of time. The Court remains convinced that lateness alone is not a material breach that can lead to a Notice of Event of Default under Section 6.01(c), and it reaffirms that holding here. But the Court cannot make a broader holding that lateness is always immaterial in light of the factual record of this case. Most important are instances where Wells Fargo sent a letter as a Notice of Default, telling an SPC that Wells Fargo believed it had materially breached the NISA and that if such a breach continued for thirty days, an "Event of Default will occur." WF RUF 65 (citing Furukawa Decl. ISO Partial Summary Judgment, ("Furukawa Decl.") Ex. 21). For example, on June 24, 2008, to MP V, an assistant vice president for Wells Fargo's corporate trust services issued such a letter, listing eight compliance documents that were late. Furukawa Decl. Ex. 21. Three documents were about five months late, three were more than two months late, one was more than a month late, and one was merely nine days late. *Id.* Drawing inferences in Plaintiffs' favor, none of the less tardy documents are

-13-

characterized as immaterial, or as merely potential material breaches, as Wells Fargo contends, WF Reply 11. A letter on the same day to MP III is to the same effect, with twelve late compliance items, two of which are only nine days late. Furukawa Decl. Ex. 21. If Wells Fargo itself treated some documents that were late as material breaches when those late documents were part of a cluster of tardy documents, then there is a genuine dispute of a material fact on this issue.

It may be helpful to clarify what breach arguments are foreclosed, and which remain viable. First, it remains true that tardiness of a compliance document, without more, is not a material breach that would justify a Notice of Event of Default. But where a reasonable, not-negligent trustee would conclude that she can no longer reasonably expect to receive a document—perhaps because the SPC has refused to provide it, or has de facto refused through lengthy delay, or there are so many missing documents—then lateness cannot be said to be immaterial as a matter of law.[10] An entirely separate argument for breach is that it is a breach to release funds when an indenture trustee does not have the documents required before the funds can be released. That argument is based on conditions precedent, not tardiness, and it is not affected by the discussion above.

Thus, to the extent an alleged breach is premised on lateness alone, summary judgment is GRANTED on the ground that such a form of tardiness is immaterial. But the issue of breach and materiality is for a jury to decide where Plaintiffs allege such a lengthy delay, or additional factors such as multiple documents missing for long periods, that a non-negligent trustee could conclude that she cannot reasonably expect to receive the documents.

//

//

//

---

[10] This fits even Wells Fargo's expert's testimony that late delivery would not reach the point of a material breach until the trustee reaches the conclusion she cannot reasonably expect to receive it.

-14-

### iii. Noteholders have Shown a Genuine Dispute as to Whether any Breach by Wells Fargo was a Cause-in-fact of their Losses

There are, of course, two components to causation, cause-in-fact (but-for cause), and proximate cause. The second, proximate cause, and its consideration of whether subsequent events cut off liability, is a typical jury question. *Semi-Tech*, 353 F. Supp. 2d at 482-83. Here, based in part on *Semi-Tech* and the Second Circuit's affirmation in *Bankers Trust*, Wells Fargo argues that whenever it threatened to declare an Event of Default, Medical Capital "complied until Wells Fargo was satisfied and advised that an Event of Default had been avoided." WF Reply 10. The motivation for MedCap's principals is obvious, as they made tens of millions of dollars on the alleged Ponzi scheme. WF RUF 106. Before August 2009, when Wells Fargo sent a notice of Event of Default to Noteholders for MP V,[11] Wells Fargo sent four separate "clock tick" notices to MP V that met the Section 9.03 requirements. *Id.* 100-04. Those notices sought overdue compliance items and, in each instance, MP V then provided items within 30 days. *Id.* 102-04.[12] Thus, Wells Fargo argues, there is no evidence that failing to give notice of any Event of Default earlier was a cause-in-fact of Plaintiffs' losses. WF Reply 10.

Because, by Wells Fargo's argument, its evidence on cause-in-fact is "undisputed," *id.*, it means that even if Wells Fargo had been "punctilious in its inspection of the certificates and had scrupulously performed its duties" under the trustee agreement, "this would not have prevented the Noteholders' losses," *Bankers Trust*, 450 F.3d at 129. To understand why this case leads to a different outcome, the Court will discuss the relevant cases from the Second Circuit and the Ninth Circuit.

---

[11] This was also before Wells Fargo declared payment defaults in MP III.1 on November 10, 2008, and in MP III.2 on December 10, 2008. WF RUF 100.

[12] Plaintiffs dispute that the items submitted actually complied with the NISAs. For example, MP V sent documents by July 22, 2008, after a letter was sent in June, but the Net Collateral Coverage Ratio Certifications failed to certify, as required by Section 3.05(h), "whether or not the Collateral Coverage Requirement is satisfied as of the last day of the month prior to the date of such certificate."

In *Bankers Trust*, the court observed two key ways that plaintiffs alleged breach: the bank failed to notice nonconformities in certificates that the company, Semi-Tech, had to provide, and the bank failed to notify noteholders of those nonconformities. 450 F.3d at 124. The district court noted the flaw in these arguments was that undisputed evidence showed no reason for a jury to find that the trustee would have given notice to noteholders. *Semi-Tech*, 353 F. Supp. 2d at 485. This is because all evidence showed that the trustee's practice, as was allowed by the indenture agreement, was first to informally seek compliance rather than jump to declare Event of Default whenever documents were received without the required language. *Id.* And further, the court concluded that had the trustee followed up informally on noncompliant documents, the company would have fixed any problem. *Bankers Trust*, 450 F.3d at 129-130.

The key here is that the district court in *Semi-Tech* found *no evidence* to support the idea that the company failed to comply when notified there were nonconforming documents—rather, *all evidence* favored the view that the company would have corrected any mistake. *Semi-Tech*, 353 F. Supp. 3d at 485-86 (characterizing plaintiffs' theories as "not only … sheer speculation," but "refuted by undisputed evidence," and lacking "a shred of evidence" in support). Because, as will be discussed below, Plaintiff Noteholders in this case can show evidence that Medical Capital was not responsive to requests to correct missing or nonconforming documents, this case is distinguishable from *Semi-Tech*/*Bankers Trust*. Further, precedent from this Circuit also supports Plaintiff Noteholders.

In the Ninth Circuit, the most important case for cause-in-fact analysis of an indenture trustee's breach is *Shawmut Bank v. Kress Associates*, 33 F.3d 1477 (9th Cir. 1994). There, plaintiffs sued after the collapse of a real estate development project funded through bonds. The money that plaintiff bondholders invested was diverted and squandered by one of the principals of Kress, the development company. *Id.* at 1482. As relevant here, plaintiffs had claims against the indenture trustee for accepting documents not signed by the appropriate Kress official, and disbursing money when arguably the developer had submitted a request without the required

"reasonable detail" as to the purpose of the disbursement. *Id.* at 1493.[13] When the district court granted summary judgment, it stated that there was simply "no evidence to show that failure to require more adequate requisitions proximately caused plaintiffs' losses," and "no evidence to show that even if 'reasonable detail' . . . had been given in the requisitions and they had been signed [by the correct employee,] that any diversions would have been discovered." *Shawmut,* 33 F.3d at 1494. In support, the district court had noted indenture contract clauses that stated that (1) the trustee was allowed to rely on certificates as sufficient evidence of the assertions in those certificates, and (2) the trustee had no obligation seek further evidence. *Id.* Thus, the court reasoned, plaintiffs failed to show that the diversions would have been caught and prevented, even if the trustee had asked for a more detailed descriptions of the purchases, and the developer provided them. *Id.*

In overturning the district court, the Ninth Circuit first noted that clause (2) above, the trustee's general non-obligation to seek further information, should not be read to thwart clause (1), the promise to examine certificates. *Id.*[14] The court then noted the bank's argument: if the company, that is, the wrongdoing entity that diverted money, had provided the required information, the trustee was entitled to rely on it, and there is no indication that the scheme would have stopped. *Id.* at 1496. Presumably the wrongdoer would supply whatever details were requested, and the trustee would not have discovered diverted money, given the limited obligations for the trustee to investigate. Thus, Plaintiffs would still have been injured, even if the trustee had refused to disburse money until nonconforming certificates were fixed. *Id.*

This exercise first assumes an action that did not happen—the trustee catching missing information, and raising the issue. Then it assumes that if the trustee had not breached, the

---

[13] The request simply read "Land and Building." *Id.*

[14] Thus, if a certificate complied with the requirements of the indenture agreement, a trustee could rely on it and need not investigate further. *Id.* But if it lacked the required 'reasonable detail,' then a trustee could not simply rest on its general discretion not to investigate further. *Id.* This holding by the Ninth Circuit shows a general concern to avoid indenture contract interpretations that would gut Noteholder protections, a concern that this Court shares.

wrongdoer would have supplied the needed information to keep the wrongdoing going, and concludes that the noteholders would still be injured. The *Shawmut* court noted that a jury was entitled to consider other possibilities—a vigilant trustee could conceivably deter a wrongdoer and, while there was no general duty to investigate as trustee, the trustee could do so if it wished. *Id.* at 1496. If a trustee did choose to investigate, that in turn could have affected the wrongdoer's behavior. *Id.* All these scenarios are, of course, necessarily speculative *Id.* at 1495. As Justice Traynor observed, "'[o]rdinarily it cannot be proved conclusively what would have happened if something else had not happened.'" *Id.* (quoting *Signorelli v. Potter*, 43 Cal. 2d 541, 545 (1954)). Choosing among those speculations is usually the job of the jury, which has the chance to hear the testimony and assess the probabilities of different outcomes. *Id.* (citing *Signorelli*, 43 Cal. 2d at 546). Where the trustee's role is not just failing to deter, but actually helping set in motion the resulting harm by releasing money, the *Shawmut* court found summary judgment on cause-in-fact to be inappropriate. *Id.* at 1497.[15] In sum, it seems fair to say that the Ninth Circuit's precedent is much more unfriendly to Wells Fargo than the Second Circuit's.[16]

Wells Fargo argued in its papers, and at oral argument, that this case is different. Plaintiffs bear the burden of proof on cause-in-fact, and in *Shawmut* the court observed that plaintiffs met that initial burden at summary judgment by showing that the developer's misdeeds are only possible because of the trustee's disbursements. *Id.* at 1498. That showing thus shifted the burden at summary judgment to the defendant bank. *Id.* In that situation, "the parties' joint failure to come forward with evidence about deterrence at the summary judgment stage is properly taxed to defendant rather than to plaintiff." *Id.* Here, Wells Fargo has put forth evidence, in the form of four specific instances when it sent "clock tick" notices to MP V

---

[15] The *Shawmut* court also was skeptical about the possibility of conclusive evidence on cause-in-fact. *See id.* n.18.
[16] *Dell'Oca v. Bank of New York Trust Co.*, 159 Cal. App. 4th 531 (2008) is no help to Wells Fargo because *Dell'Oca* upheld a finding of no cause-in-fact *after* a jury was able to weigh evidence and arguments at trial. Such a decision, if it bears on this case, would support letting the case go to trial.

warning that if MP V did not supply missing documents, it would declare an Event of Default. WF RUF 100-04. As noted, Plaintiffs contend that even those documents submitted by MP V still fell short of requirements of the NISAs. *Supra* at note 8. At oral argument, Wells Fargo countered by saying Plaintiffs miss the point: the four instances show that even if Wells Fargo complained about the documents submitted in response to "clock tick" notices, that complaint would change nothing. MP V would have complied as many times as necessary to satisfy follow up requests.

The reason Wells Fargo's argument cannot support summary judgment is that it only counts "clock tick" notices as evidence, and disregards contrary indications from repeated requests from the trustee to Medical Capital. For example, Section 3.05(h) of the NISAs required a written certification that set forth the Net Collateral Coverage Ratio (NCCR) and whether the required ratio (meaning enough assets to cover liabilities) was met as of the last day of the prior month. On March 12, 2007, Wells Fargo employee Cheryl Zimmerman noted that the ratio was not "certified by an authorized signer of  [MP III]." Molumphy Decl. (Dkt. 464-2), Ex. 25. As Plaintiffs contend, Wells Fargo raised this requirement repeatedly during the time it served as trustee, and this concern endured despite Wells Fargo raising it in correspondence with Medical Capital after the March 12, 2007, e-mail. *See, e.g.*, *id.* at Exs. 22, 30, 38-43, 58-60 . Yet on March 13, 2009, Zimmerman, writing to another Wells Fargo employee, explained that the trustee did not receive a written certification in compliance with the March 12, 2007, e-mail. *Id.* at Ex. 23. On March 23, 3009, Zimmerman wrote to Medical Capital to make clear that "given the current issues," with compliance, "it is necessary for a stricter adherence" to the NISAs, and that the NCCR calculation "needs to include a written certification, signed by an authorized officer of the debtor." *Id.* at Ex. 22.[17] This point is reinforced by evidence of transactional documents that Wells Fargo demanded, but did not receive. *See id.* at Ex. 25 (demanding

---

[17] Wells Fargo did not get signed certifications for months prior to March 2009, electing to demand compliance only going forward. *Id.*

purchase documents and instruments assigning acquired receivables); Furukawa Decl. in Support of Pls' Mot. for Summary Judgment (Dkt. 460), at Ex. 13 (Wells Fargo admission that it did not receive purchase documents before disbursing money from trust accounts to acquire receivables); *see also*, Molumphy Decl. at Ex. 24 (Zimmerman December 12, 2007, e-mail demanding an A-2 certificate with the value of each non-receivable asset and the basis of the valuation); *id.* at Ex. 36 (Zimmerman February 7, 2008, e-mail repeating that this information must be provided).

Thus, for the above reasons, Wells Fargo's Motion for Summary Judgment with respect to cause-in-fact is DENIED.

### iv. Sufficient Evidence Establishes a Triable Issue as to Whether Wells Fargo Breached the NISAs by Disbursing Funds from the SPCs to Other SPCs in "Bad Faith"

Section 5.06(a)(ii) of the NISAs provided that, "[i]n the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements" of the NISA. Where a NISA section specifically required that a certificate or opinion be given to the Trustee, the Trustee had a duty to examine it to determine if it conformed to the form required and the statements required by the NISA. *Id.*

Prior motion practice established two possible standards for bad faith: a trustee's actual knowledge, or a trustee ignoring obvious red flags. First *Masonek* Order 7; Second *Masonek* Order 10. Wells Fargo relies on a treatise, ROBERT I. LANDAU & JOHN E. KRUEGER, CORPORATE TRUST ADMINISTRATION & MANAGEMENT 67 (5th ed. 1998), for actual knowledge as the standard, as did the First *Masonek* Order. Plaintiffs point to the Restatement (2d) of Contracts Section 205 (1981) for the slightly lower standard, which would also encompass actual knowledge. Given language in other areas of the NISA that disclaim a duty to investigate (e.g., Section 5.06(g), 5.06(m), and 5.06(a)(ii) itself in MP V), actual knowledge is consistent with the

NISA, Wells Fargo argues. In contrast, Plaintiffs argue this standard "would create near-absolute immunity for indenture trustees." Pls.' Opp'n 18.

This Court finds that Plaintiffs' standard is closer to the mark, and that conduct close to, but short of, actual knowledge can constitute bad faith. The NISAs are hardly a model of clarity, but in declining to define "bad faith," the contract leaves it to a court to interpret the term. Further, a few subsections later, in Section 5.06(g), the NISA states that the Trustee is able to rely on certain information "except to the extent the Trustee has actual knowledge to the contrary." Thus the drafters knew how to deploy the language of "actual knowledge," and could have used it as defining bad faith, if such was their intent.

By either standard, Plaintiffs are entitled to reach a jury on bad faith as to transfers of assets between the SPCs. This is because an e-mail from Wells Fargo employee Cheryl Zimmerman to Thomas Fazio, counsel for Medical Capital, states that Zimmerman had discussed with Wells Fargo's counsel the transfers among SPCs, and that "[s]ome of the discussions have surrounded whether this is permitted under the [NISAs]." Internal reports at Wells Fargo for meetings on October 23, 2007 (before the e-mail), May 7, 2008, and October 29, 2008 (both after the e-mail) could, drawing all reasonable inferences in Plaintiffs' favor, support a finding that Wells Fargo saw a clear red flag about transfers that served no valid purpose, but ignored it.

The reason a jury could find that the transfers served no valid purpose is that Zimmerman, testifying as Wells Fargo's corporate designee, could not identify a possible legitimate business purpose for inter-SPC transactions. Pls.' Opp'n SUF 119. Zimmerman's testimony is, of course, not the final word,[18] and other interpretations are possible. For example, perhaps, as Wells Fargo argues, repeated mention of inter-SPC transfers in reports prepared for meetings "did not signify any ongoing concern." WF RUF 117. And perhaps Zimmerman's

---

[18] One might expect, however, that Plaintiffs will argue at trial that Zimmerman had considerable time to reflect on a plausible benign reason for transfers, and her inability to do so is thus particularly notable.

-21-

concern was with how such transfers could take place, such as in purchases of collateral in parts. WF Reply 13. Finally, the fact that Wells Fargo's employees testified they did not know of fraud, or of obvious red flags, should not be too much of a surprise.[19] Determining their credibility is appropriate for the jury.[20]

The Court, mindful that whether an indenture trustee's "conduct was unfair or in bad faith is, of course, an issue for the jury," *Broad v. Rockwell Int'l Corp.*, 614 F.2d 418, 431 (5th Cir. 1980), finds Plaintiffs have presented sufficiently strong evidence to avoid summary judgment on this issue.[21]

### v.  Receipt of Certain Documents were Conditions Precedent to the Trustee Making a Disbursement

Wells Fargo makes two brief arguments that various documents were not conditions precedent to the Trustee making a disbursement. The various documents here are: (i) an array of general periodic compliance documents, WF Mot. 17 n.8; (ii) Net Collateral Coverage worksheets; (iii) approved payor certificates; (iv) purchase documents for receivables; (v) purchase documents for non-receivable assets, (vi) opinion letters for non-receivable assets under Section 3.05(b).[22] This is because conditions precedent are generally disfavored, absent strong language supporting a condition rather than a promise. *See, e.g.*, *Fed. Deposit Ins. Corp. v. Air Fla. Sys., Inc.*, 133 Cal. App. 4th 1257, 1259 (1997). Further, Wells Fargo makes the cause-in-fact argument that the Court has already rejected in this Order.

---

[19] Medical Capital's employees not working in management testified that they did not suspect wrongdoing. WF Statement of Uncontroverted Facts 119-20. That no one volunteered herself for potential investigation for civil or criminal liability does not settle this basic factual dispute.

[20] For the reasons discussed in the Plaintiffs' Motion for Summary Judgment, below at Section IV.b.ii, Wells Fargo is also not entitled to summary judgment on bad faith with respect to disbursements made for Administrative Fees where the Net Collateral Ratio remained constant over about six months.

[21] Here the evidence is stronger than cases where plaintiffs, trying to show fraud, have presented simply conclusory assertions, *In re Worlds of Wonder Secs. Litig.*, 35 F.3d 1407, 1427 (9th Cir. 1994), or no direct evidence and "weak" indirect evidence, *California Architectural Bldg. Prods, Inc. v. Francisco Ceramics, Inc.*, 818 F.3d 1466, 1470 (9th Cir. 1987).

[22] Wells Fargo also lists certifications and opinion letters under Section 9.05, but these will be discussed below, and summary judgment granted in Wells Fargo's favor, in subsection viii.

Because the arguments about conditions precedent are more fully briefed in Plaintiffs' Motion for Partial Summary Judgment, much of the discussion appears below, beginning at Section IV. Where the Court finds a condition precedent, even if negligent breach is a jury question, such a finding precludes summary judgment in favor of Wells Fargo. But as Plaintiffs do not make an argument that periodic compliance documents are a condition precedent, *see* Pls.' Opp'n 14 n.9, summary judgment is GRANTED as to those documents not being a condition precedent. Thus, it cannot be a breach merely because the Trustee disbursed funds without having such documents. The same is true of approved payor certificates. *Id.*[23] And, as discussed below, receipt of the Net Collateral Coverage Reports is not a condition precedent. Finally, whether Purchase Documents for non-receivable assets are a condition precedent is a jury question, in light of conflicting provisions and reasonable questions as to the intent of the contracting parties.

### vi. Plaintiffs do not Provide Sufficient Evidence to Survive Summary Judgment on Claims for Bad Faith in Disbursing Funds for the Purchase of Ineligible Assets

Plaintiffs allege breaches when the Trustee allowed SPCs to buy receivables older than 180 days (thus not meeting the NISA definition of Eligible Receivables) and non-receivable assets that were not related to the healthcare industry. Wells Fargo's Statement of Uncontroverted Facts in Support of Summary Judgment 139. Wells Fargo correctly notes that, prior to an Event of Default, it could rely on representations that assets were eligible, absent bad faith, *see* NISA Section 5.06(a)(ii), and Plaintiffs make no argument, and provide no evidence, to counter this assertion as to non-receivable assets, WF Reply 21. As to receivables, other than assertions that Wells Fargo had to know, *see* Pls.' Opp'n 21, Plaintiffs rely on their central theory of breach, the failure to declare Event of Default, *see id.* 23. Unlike the issue of inter-SPC

---

[23] These documents could be late without making every disbursement request claiming not to be in default  materially false and misleading. As noted above, lateness alone is not per se material.

transfers, here Plaintiffs fall short of presenting enough specific evidence to survive summary judgment. Thus, summary judgment is GRANTED as to breach, prior to Event of Default, for bad faith disbursements to buy ineligible receivables and non-receivables.

The caveat to this holding is that Plaintiffs could still show breach under a "prudent person" standard, if a jury finds that Wells Fargo *should have* declared an Event of Default before a particular disbursement. As neither party adequately briefed this issue, *see* WF Mot. 19; Pls.' Opp'n 21, 23, and it is a different theory of breach than bad faith prior to Event of Default, it survives summary judgment.

### vii. Wells Fargo is not Entitled to Summary Judgment Based on Breaches Related to Security Interests

Plaintiffs allege breach by Wells Fargo because it failed to ensure it had a first priority security interest in certain collateral. WF RUF 147. Wells Fargo argues that there is no evidence Plaintiffs' losses were caused by such a breach, and this same logic applies to other alleged breaches for failing to obtain purchase documents, opinions of counsel, copies of promissory notes, etc. WF Mot. 20, 20 n.12. As an initial matter, Wells Fargo's passing footnote seeking to apply a limitation on damages to a wide range of documents is not a sufficiently developed argument to justify summary judgment. While such documents may serve an interest of protecting the Trustee's security interest, that is not necessarily their only function. Further, any limit on damages would not change the fact that Plaintiffs can pursue breach for nominal damages. *See Silicon Image, Inc. v. Analogix Semiconductor*, 642 F. Supp. 2d 957, 964 (N.D. Cal. 2008) (citing Cal. Civ. Code § 3360; *Sweet v. Johnson*, 169 Cal. App. 2d 630, 632 (1959)). Thus, summary judgment is DENIED as to these claims.

### viii. Wells Fargo is Entitled to Summary Judgment on Claims Based on Failure to Receive Certifications and Opinions Pursuant to Section 9.05

Wells Fargo argues that it committed no breach of NISA Section 9.05 if, as alleged by Plaintiffs, it disbursed funds for Administrative Fees or purchases of Receivables, or the sale of

-24-

assets, without receiving certificates or opinions of counsel allegedly required under Section 9.05. WF Mot. 21. The Court agrees.

The Section begins in broad terms, stating that upon "any request" by the Debtor to the Trustee to take "any action" under the NISA, the Debtor must furnish (a) a written certificate signed by certain officers stating all conditions precedent for the proposed action have been met; and (b) an opinion of counsel similarly stating that all conditions precedent have been met for the action. NISA Section 9.05. However, the last part of the Section adds: "provided that in the case of any such request or application as to which the furnishing of such documents is specifically required by any provisions of this Note Agreement relating to such particular application or request, no additional certificate or opinion need be furnished." Thus, what seems initially to apply to "any request," does not, in fact, impose an additional demand for a certificate or opinion of counsel if those documents are already specifically required by another part of a NISA. Wells Fargo may be liable for not obtaining required documents before disbursements under the specific NISA provision requiring such documents, but it is not liable under Section 9.05's "catch-all" language.

Thus, the Court GRANTS Wells Fargo's Motion as to breach for disbursed funds for Administrative Fees or purchases of Receivables, or the sale of assets, allegedly in violation of NISA Section 9.05.

### ix. Wells Fargo is not Entitled to Summary Judgment on Alleged Improper Payments of the Administrative Fee

Wells Fargo argues it is entitled to summary judgment on a variety of alleged improper payments of the Administrative Fee. That fee, defined in Article I of the NISAs, is "the monthly fee" that is payable to the Administrator (defined, as relevant here, as Medical Capital Corporation) "for the performance of its services under the Administration Agreement, in an amount equal to the balance remaining in the Trust Account after payment of the Trustee fees as well as accrued interest and principal due to Noteholders in such month . . . ." Section 5.08(a)(ii), regarding withdrawals by the Trustee, states that the Trustee "shall withdraw from

the Trust Account and pay . . . as and when instructed by the Debtor in writing . . . the following amounts in the following order of priority." "To pay the Administrative Fee" appears at 5.08(a)(ii)(F) as an amount that can be paid.

Wells Fargo argues that the Court should grant summary judgment as to three types of breach claims: (1) paying Administrative Fees more than once each month; (2) paying the Administrative Fee to entities other than the Administrator; (3) paying other fees to the Administrator. WF Mot. 21-23. No NISA provision explicitly disallows those actions, Wells Fargo argues. Further, the NISAs do not say the Administrative Fee "must be taken all at once, rather than in installments," or that the fee must be *directly* paid to the Administrator. *Id.* These interpretations are in tension with the language of Section 5.08(a)(ii) that withdrawals from the Trustee Account shall be to pay "the following amounts in the following order of priority," which then leads to descriptions of authorized types of payments, none of which includes the three types of payments that are alleged as breaches. Wells Fargo may choose to argue to the jury that (1) what is not prohibited or mentioned is allowed; (2) that the fact those payments did happen means they were allowed; or (3) that it was not negligent in any case to make those disbursements. *See* WF Mot. 21-23. But it is not entitled to summary judgment on such readings that clearly could leave jurors skeptical.[24]

---

[24] Similarly, Wells Fargo is not entitled to summary judgment on the allegation that it was a breach to fail to segregate revenues and noteholders' funds from other funds of the SPCs. WF Mot. 23-24. This alleged breach is from the language in Section 5.08(c) that "all subscription proceeds and all Revenues received by the Debtor, if any, in respect of the Collateral shall be immediately remitted to the Trustee for deposit into the Trust Account, which Revenues shall at all times be segregated from other funds of the Debtor." The fact that this clause includes a Debtor responsibility does not change the fact that once the Debtor "remit[s] to the Trustee for deposit," the Trustee would be the obvious entity then able to segregate the funds. Similarly, Section 5.08 gives no indication that permissible deposits include ones made by Medical Capital Corporation. Wells Fargo's own administrator did not know if the deposits were allowed. Pls.' Opp'n SUF 144. This ambiguity and the intent of the parties is a jury question, and thus summary judgment is DENIED.

**x.  Plaintiffs Made no Argument Against Wells Fargo's Motion for**
**Partial Summary Judgment as to Disbursements Violating the**
**Priorities and Timing of Disbursements in Section 5.08**

The Motion is GRANTED for partial summary judgment on any claim of breach for
disbursements violating the priorities of payments set out in Section 5.08.  As Wells Fargo
correctly notes, WF RUF 163, Plaintiffs provided no evidence in opposition.

\*      \*      \*

**IV.    Analysis — Plaintiff Noteholders' Motion for Partial Summary Judgment**

**a.  Plaintiffs are Clearly Third-Party Beneficiaries of the NISAs**

The Court finds that there is no real dispute that Plaintiffs—here meaning Class
(*Masonek*) and Mass Action (*Bain* and *Abbate*) members who invested in MP III.1, MP III.2,
and MP V—are third-party beneficiaries of the respective NISAs for the SPCs they invested
in.[25] The NISAs provide that the contract exists "for the equal and ratable benefit of the
Noteholders." SUMF 3-4. Wells Fargo's corporate designee, Cheryl Zimmerman, testified that
the bank served as trustee for the benefit of Noteholders. *Id.* 5-6. The bank's indenture trustee
expert, Christopher Hillcoat, agreed that Noteholders are third-party beneficiaries. *Id.* 5, 7. And
this Court has repeatedly held that Plaintiffs are third-party beneficiaries. *See, e.g.*, Order
Granting Class Certification 7 (Dkt. 240).

Wells Fargo argues that Noteholders are not necessarily third party beneficiaries to every
aspect of the NISAs, but it does not then identify any particular promise currently relevant to the
case where such a distinction would make a difference.

Accordingly, the Court GRANTS Plaintiffs' Motion as it pertains to the third-party
beneficiary status of Plaintiffs for the respective NISAs for the SPCs they invested in. The Court

---

[25] The Court hereby takes judicial notice of the Declaration of Thomas A. Seaman in Support of Report
on the Status of Claims and Request to Determine Outstanding Unresolved Claims and Approve MIMO
Claim Approach, Dkt. 701 and accompanying Exhibit 1, Dkt. 708 filed in *SEC v. Medical Capital
Holdings, et al.*, No. 8:09-cv-00818-DOC-RNB.

believes this holding addresses the objections Wells Fargo made in its Opposition as to the breadth of Plaintiffs' Motion on this issue.

### b. Disbursements from MP III.1 to Acquire Receivable Assets Without Obtaining "Purchase Documents"

Section 5.08(a)(ii)(E) provides that the Trustee shall make disbursements as directed for the purchase of Eligible Receivables "provided that" the Trustee has received an authorized and executed certification substantially in the form of Exhibit A-1 to the NISA. As relevant here, Exhibit A-1, a Receivable Acquisition Certification, required the SPC to certify that it had "been previously, or are herewith, provided with the following items," items that include a copy of Purchase Documents between the SPC and seller of the receivable. Purchase Documents for receivables included a purchase agreement, and security documentation, including bills of sale. When Zimmerman, the Wells Fargo employee overseeing the trust administration, noticed that copes of the Purchase Documents for MP III were not sent with the Exhibit A-1, nor previously provided to Wells Fargo, she wrote Medical Capital an e-mail to note the absence and request all such copies "as soon as possible." Molumphy Decl. (Dkt. 464-2) Ex. 25.

Here, the language supports a condition precedent. Indeed, "provided that," usually supports a condition precedent, rather than a promise. 13 Williston on Contracts § 38:16 (4th ed.) (citing, among other cases, *In re Earnest*, 42 B.R. 395 (Bankr. D. Or. 1984)). The Exhibit A-1 then requires a certification either that the Purchase Documents were provided earlier, or that they are hereby being provided. Because the Exhibit is a condition to disbursement, it follows that Purchase Documents are as well. Wells Fargo's own expert construed the MP III.1 NISA in the same manner. Because the language is clear, the parties' conduct of not having the Purchase Documents prior to disbursement does not affect this interpretation.

Thus, while the Court finds a condition precedent, thus obviously precluding summary judgment in Wells Fargo's favor, it notes that in order for this to be a breach leading to liability, Plaintiffs must overcome the indenture agreement's strong immunity provisions for the indentured trustees. Section 5.06(i) clearly states that Wells Fargo "undertakes to perform such

-28-

duties and only such duties as are specifically set forth" in the indenture agreement and "no implied covenants or obligations shall be read into this Note Agreement against [Wells Fargo]." Further, Section 5.06(j) provides that Wells Fargo "shall not be liable for any action it takes or omits to take in good faith which it believes to be authorized or within its rights or powers; provided, however, that [Wells Fargo's] conduct does not constitute willful misconduct, negligence or bad faith." The agreements also immunized Wells Fargo from liability for actions taken "at the direction of" Medical Capital, except for negligence or willful misconduct in the performance of its express duties under the agreement. NISA Section 5.06(f). In order for Wells Fargo to be liable under the indenture agreements its conduct must, at the very least, rise to the level of negligence.

That is a jury question in this context, where Plaintiffs have submitted evidence that Wells Fargo employees in charge of making the disbursements lacked any familiarity with the requirements of the NISAs and did not recall any training on the subject. Pls.' Opp'n SUF 106-07.

### c.  Disbursements to Acquire Non-Receivable Assets

#### i.  Certifications of Value and Lien Priority

The Noteholders argue that Wells Fargo breached the MP III.1 and MP V NISAs in instances in which it disbursed funds for the purchase of non-receivable assets based on Exhibit A-2 Certificates that did not include a certification of the value of the asset, the basis of valuation, and the priority of Wells Fargo's lien on the asset. Pls.' Mot. 7. The Noteholders' argument is based on Section 3.01(b)(i), which requires the SPCs to provide a certificate "substantially in the form of" Exhibit A-2 which "shall certify the Value of Each of the Non-Receivable Assets set forth on the certificate and the basis for the valuation thereof and the priority of the lien granted hereunder to the Trustee." NISA Section 3.01(b)(i). Wells Fargo's position is that, at least with respect to MP III.1, it did not breach the agreement by failing to obtain valuation and lien priority certifications. Wells Fargo argues that the only express condition precedent to disbursement of funds for non-receivable assets was receipt of a "duly

authorized and executed certification substantially in the form of Exhibit A-[2][26] to this Note Agreement." MP III.1 NISA Section 5.08(a)(ii)(E). Given that Exhibit A-2 attached to the MP III.1 NISA did not include a certification of value and lien priority, Wells Fargo argues, based on the literal terms of the express condition precedent contained in Section 5.08(a)(ii)(E), it did not breach the agreement. *See* WF's Opp'n 8-10. Wells Fargo also argues that comparable information regarding value, basis of valuation, and lien priority was provided through other documents, including the opinion of counsel and the annual certificate required by Section 3.05(i). In light of the fact that the version of Exhibit A-2 attached to the MP V NISA did provide for the inclusion of the valuation and lien priority certification, Wells Fargo concedes that it was a breach to disburse funds under that agreement without first obtaining the certification. WF's Opp'n 8.

Unlike the issue of disbursements for receivable assets without purchase documents, here, the NISAs themselves do contain a provision requiring submission of value and lien priority certifications. Now that the Exhibit is favorable to Wells Fargo, it would have the Court give effect to the terms of the Exhibit over the terms of the agreements themselves. The Court declines to do so.

However, here again Wells Fargo has produced evidence creating a genuine dispute as to whether its failure to obtain valuation and lien priority certifications prior to disbursing funds was a "negligent" breach under the MP III.1 and MP V NISAs. Given the conflict between the NISA and the attached Exhibit A-2, and in light of the fact that Wells Fargo possessed at least some of the information in question through receipt of other documents, including the opinions of counsel, there is a genuine dispute as to whether the absence of a certification as to the value,

---

[26] The provision in question actually made reference to "Exhibit A-1" only. Wells Fargo contends, and the Court has little trouble finding, that this provision's reference to Exhibit A-1 alone was a scrivener's error given that the provision pertains to funds for the purchase of either receivable or non-receivable assets. Given that Exhibit A-1 was for receivable assets and Exhibit A-2 was for non-receivable assets, it is clear that the parties intended to require certification in the form of Exhibit A-1 or Exhibit A-2 depending on whether receivable or non-receivable assets were involved.

basis of valuation, and lien priority with Exhibit A-2 was a negligent breach on the part of Wells Fargo. This question is therefore best left to determination by the jury.

The Court therefore DENIES the Noteholders' Motion for Partial Summary Judgment insofar as it seeks to establish breach by Wells Fargo for failure to obtain value and lien priority certifications. It necessarily DENIES Wells Fargo's Motion on the same issue.

### ii.      Opinions of Counsel

The parties do not dispute that Wells Fargo was required to obtain opinions of counsel from the SPCs as a condition precedent to disbursement of funds in connection with each purchase of non-receivable assets. *See* Plaintiffs' Statement of Uncontroverted Facts in Support of Motion for Partial Summary Judgment (Dkt. 459) ("Pls.' Mot. SUF") 23–24. Section 3.05(b) of each NISA provides that:

> [A]s a condition precedent to the disbursement of funds pursuant to Section 5.08(a)(ii)(E), the Debtor shall deliver at Debtor's expense an opinion of counsel to the effect that immediately following the acquisition of the Non-Receivable Assets the Trustee will have a perfected security interest therein, which security interest is subject to the provisions of this Note Agreement.

NISA Section 3.05(b). The Noteholders argue, however, that Wells Fargo breached this obligation when it failed to obtain opinions of counsel prior to making disbursements to MP III.2 for purchases of non-receivable assets. Pls.' Mot. 7. Wells Fargo points out that the purchases in question were merely transfers of assets between MP III.1 and MP III.2 as to which Wells Fargo had already received conforming opinions of counsel when the assets were initially purchased by MP III.1. In other words, the parties dispute whether Wells Fargo was required to obtain new opinions of counsel when collateral held on behalf of one series of noteholders (MP III.1 noteholders) was purchased by the second series of noteholders (MP III.2 noteholders).

Wells Fargo asserts that the initial opinions of counsel satisfied its obligation under the NISAs given that each of the original Opinion letters stated that MP III would have a perfected security interest in the asset and Wells Fargo would obtain a valid assignment of that perfected

security interest, and the transfer of the collateral between the two series of notes (MP III.1 and MP III.2) had no effect on the security interest at issue. The Noteholders counter that the operative provision expressly requires an opinion of counsel stating that the security interest "is subject to the provisions of this Note Agreement," and, given that the initial opinions of counsel would have been subject to the provisions of the MP III.1 Note Agreement and not the MP III.2 Note Agreement, Wells Fargo was required to obtain new opinions of counsel and its failure to do so was a breach. Although the Noteholders assert that the MP III.1 NISA and the MP III.2 NISA were separate and distinct agreements, they fail to cite any evidence that the provisions of the two agreements differed in any aspect material to the perfection of a security interest in the Debtor and Wells Fargo. *See* Pls.' Reply 10.

There is a genuine dispute of material fact as to whether Wells Fargo was required to obtain new opinions of counsel in connection with MP III.2's purchases of non-receivable assets from MP III.1 and whether its failure to do so was a breach under the applicable agreements.

The Noteholders allege, and Wells Fargo concedes, that on one occasion it disbursed funds to an SPC other than MP III.2 for the purchase of non-receivable assets without first receiving an opinion of counsel. Pls.' Mot. SUF 27. Wells Fargo disbursed $1,621,188 to MP V for the purchase of assets related to Integrated Medical Management on or about December 10, 2007. *Id*. Wells Fargo concedes that this was a breach of the MP V NISA, but asserts that the opinion letter was received on the same day the disbursement was made. WF's Opp'n 11 n.9; Furukawa Decl. Ex. 14, at 32–33.

Although the Noteholders have shown that Wells Fargo disbursed funds for the purchase of Integrated Medical Management prior to receiving an opinion of counsel as required by Section 3.05(b) of the NISAs, there is no evidence before the Court indicating that the opinion of counsel was received any later than that same day. *See* Furukawa Decl. Ex. 14, at 32–33 ("Wells Fargo . . . received an opinion of counsel in connection with that disbursement within minutes of making the disbursement."). The Noteholders have not shown that this brief delay in receipt of the opinion of counsel was the cause of any damage to them as a matter of law. Thus,

while such a ruling does little to narrow the issues at trial, the Court GRANTS summary judgment on the narrow issue of breach in the disbursement of December 10, 2007.

In all other respects, however, the Court DENIES both Parties' Motions for partial summary judgment with respect to breach for failure to obtain opinions of counsel for MP III.2's purchase of non-receivable assets from MP III.1.

### iii.   Non-Receivable Asset Purchase Documents

Section 5.08(a)(ii)(E) again begins the analysis, as it provides that the Trustee shall make disbursements as directed for the purchase of Eligible Non-Receivable Assets "provided that" the Trustee has received an authorized and executed certification substantially in the form of Exhibit A-2 to the NISA. As relevant here, Exhibit A-2, a Non-Receivable Acquisition Certification, required the SPC to certify that it had "been previously, or are herewith, provided with the following items," items that include a copy of bills of sale, the agreement between Debtor and seller, and various other instruments.

The problem is that NISA Section 3.05(a) overlaps in its commands to the Debtor, and it provides that if a Non-Receivable is evidence by a promissory note, or other instruments, the "Debtor shall promptly deliver possession to the Trustee" documents "accompanied by a certificate in the form of Exhibit A-2." This is less clear language for a condition precedent: providing a document "promptly," and accompanied by an Exhibit A-2, does not mean those documents necessarily precede disbursement. And in the next subsection, the language is far clearer in establishing that an opinion of counsel is "a condition precedent to the disbursement of funds pursuant to Section 5.08(a)(ii)(E)." Section 3.05(b). It may well be odd for the Trustee to face condition precedent language—"provided that"—in Section 5.08(a)(ii)(E), while a Debtor is required only to make prompt delivery. The Court finds that this does not foreclose the possibility that the documents are a condition precedent—one could find that intent of the parties was to be consistent in treatment of purchase documents, whether for Non-Receivables or Receivables. But it does make for a stronger argument for Wells Fargo in support of not

finding a condition precedent, and thus summary judgment is inappropriate in either side's favor.

### d. Disbursements for Administrative Fee

Whenever Medical Capital requested a disbursement of an administrative fee, it was required to provide to Wells Fargo "a certification to the Trustee with its request, to the effect that the Collateral Coverage Requirement is satisfied (after giving effect to the requested disbursement) on the basis of the Net Collateral Coverage Ratio calculated and provided by the Debtor to the Trustee as of the last day of the month preceding the month in which such request is made." NISA Section 3.05(h). The Noteholders claim that administrative fee requests submitted to Wells Fargo breached the indenture agreements in several respects.

### i. Forms Containing Blanks

The Noteholders claim that Wells Fargo breached the indenture agreements by disbursing funds for payment of administrative fees to MP V on nine separate occasions based on requests in which the space for stating the NCCR was left blank. Wells Fargo admits that it was a breach of the NISAs to disburse funds on those nine occasions without first requiring Medical Capital to cure the defect in the form. WF's Opp'n 12–13. Wells Fargo disputes, however, that this breach was the cause-in-fact of any damages to the Noteholders. *Id.* 13.

Given that the Court rejects Wells Fargo's causation argument in its ruling on Wells Fargo's Motion for Summary Judgment, Wells Fargo's sole grounds for opposing the Noteholders' motion with respect to breach on these nine occasions fails.

The Court therefore GRANTS the Noteholders' Motion for Partial Summary Judgment and finds that Wells Fargo breached the MP V NISA by disbursing administrative fees on the nine occasions when the request contained a blank space for the NCCR.

### ii. Forms with a Constant Net Collateral Coverage Ratio

The Noteholders next argue that Wells Fargo breached the indenture agreement by disbursing funds for payment of administrative fees to MP V on thirty occasions from September 3, 2008, through March 16, 2009, based on requests that each stated the identical

NCCR percentage – 103.86%. According to the Noteholders, an identical NCCR over this long of a period was a "facially impossible scenario" given that the ratio was to be calculated based on current assets and liabilities at the time of the request, which would necessarily fluctuate on a day-to-day basis.

Wells Fargo correctly points out that any liability based on the identical NCCR in the requests is necessarily limited by Section 5.06(a)(ii) of the MP V NISA, which provides:

> In the absence of bad faith on its part, the Trustee may conclusively rely as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Note Agreement (it being understood that the Trustee shall have no obligation to investigate or confirm the accuracy of any mathematical calculations or other facts stated therein); but in any case of any such certificates or opinions which by any provisions hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they conform as to form with the requirements of this Note agreement and whether or not they contain the statements required under this Note Agreement.

Therefore, in order to prevail on this issue the Noteholders must show that there is no genuine dispute that Wells Fargo acted in bad faith in making disbursements for administrative fee requests containing identical NCCRs. As noted in the discussion of bad faith in Wells Fargo's Motion for Summary Judgment, the Noteholders rely on an e-mail from Wells Fargo Account Manager Cheryl Zimmerman to a Medical Capital employee in which Ms. Zimmerman inquired into requests with identical NCCRs. Pls.' Mot. 12. The Noteholders assert that Ms. Zimmerman failed to follow up on this inquiry and this conduct amounted to bad faith on the part of Wells Fargo. In response, Wells Fargo sets forth a rather technical argument to the effect that each of the requests that were the subject of Ms. Zimmerman's email occurred in the span

of one month, and it was plausible that the NCCR figure Medical Capital was providing on its requests was calculated as of the last day of the month preceding the request, which would account for identical NCCRs in all requests made within a single month. Ms. Zimmerman's email does, in fact, appear to support this possibility, given that she asked the individual at Medical Capital, "Are you reflecting on the Administrator's Request the ratio as of the last day of the month preceding the month in which such request is made...?" Furukawa Decl. Ex. 20. Wells Fargo submitted an internal Medical Capital email indicating that Medical Capital was, in fact, using the NCCR from the end of the prior month on each request form. *See* Soloff Decl. Ex. 16, MDL Dkt. No. 478. Furthermore, this approach appears to be contemplated by the language of Section 3.05(h), which requires a certification that the collateral coverage ratio is satisfied "on the basis of the Net Collateral Coverage Ratio calculated and provided by the Debtor to the Trustee as of the last day of the month preceding the month in which such request is made." Given the evidence presented by Wells Fargo, the Court cannot find that, with respect to the administrative fee requests containing a constant NCCR within the span of a single month, Wells Fargo acted in bad faith as a matter of law.

This rationale does not apply with equal force to the fee requests that were made over a period greater than one month. No evidence has been submitted, however, indicating that Wells Fargo was actually aware of the constant NCCR percentage in fee requests made outside the span of a single month. Nor has evidence been submitted showing that the NCCR—if it had been correct on these requests—would have been below 100%, thereby plausibly leading to the withholding of administrative fees. Wells Fargo's corporate trust industry expert, Christopher Hillcoat, opined that an indentured trustee in the position of Wells Fargo would not be

reasonably expected to compare NCCR percentages in disparate requests. Hillcoat Decl. Ex. 2, at 3. Although it may seem tempting to find bad faith based on multiple requests with the identical NCCR when all such requests have been conveniently bundled together and presented to display a clear pattern, and when one has the benefit of hindsight, it must be remembered that discovery of these discrepancies has been the product of years of litigation and extensive *post hoc* investigation—exactly the type of in-depth investigation the indenture agreements generally did not require Wells Fargo to perform. Whether Wells Fargo's conduct amounted to bad faith in light of the many conflicting factors at play is precisely the sort of factual question best left for decision by the jury.

Finding that a genuine dispute exists, the Court therefore DENIES the Noteholders' Motion for Partial Summary Judgment regarding disbursements for administrative fees based on requests containing identical NCCR percentages.

### iii.   Absence of Monthly NCCR Calculations

Pursuant to Section 3.05(h) of the NISAs, the SPCs were required to provide a monthly certification setting forth the calculation of the NCCR and whether the collateral coverage requirement was met for the last day of the preceding month (the "NCCR Report"). Apparently, the SPCs were chronically late in providing this certification—often weeks or months late. *See* Pls.' Mot. SUF 64. The Noteholders argue that each time Wells Fargo disbursed funds to pay an administrative fee while the NCCR Report was late and outstanding it committed a breach of the indenture agreement.

The applicable provision of the NISAs provides as follows:

> The Debtor shall provide, or cause the Administrator to provide, on the 15th of each month, a written certification to the Trustee, in such form as the Trustee and the Debtor shall agree upon, which sets forth the calculation of the Net Collateral Coverage Ratio and whether or not the Collateral Coverage Requirement is satisfied as of the last day of the month prior to the date of such certificate. In addition, whenever the Administrator shall request disbursement of the Administrative Fee by the Trustee, the Debtor shall provide, or cause the Administrator to provide, a certification to the Trustee with its request, to the effect that the Collateral Coverage Requirement is satisfied (after giving effect to the requested disbursement) on the basis of the Net Collateral Coverage Ratio calculated and provided by the Debtor to the Trustee as of the last day of the month preceding the month in which such request is made.

NISA Section 3.05(h).

Wells Fargo argues that Section 3.05(h) does not make receipt of the NCCR report a condition precedent to the disbursement of administrative fees. Rather, it argues, the provision contemplates two separate documents: the monthly NCCR Report, described in the first sentence, and the certification to be provided each time the SPC requests an administrative fee, detailed in the second sentence.

It should be noted that the NISAs do not contain any provision expressly requiring receipt of the NCCR calculations prior to disbursement for administrative fees. Other provisions of the NISAs create express conditions precedent. *See* Section 3.05(b) ("With respect to the acquisition of Non-Receivable Assets, as a condition precedent to the disbursement of funds . . . the Debtor shall deliver at Debtor's expense an opinion of counsel...."). Evidence of the parties' course of conduct regarding transmission of the NCCR Report also suggests it was not considered a condition precedent to disbursement of administrative fees. The Noteholders, therefore, ask the

Court to infer a condition precedent where one is not stated by the express terms of the agreement.

California law as well as Ninth Circuit precedent both hold that "[c]onditions precedent are not favored and the courts will not construe stipulations as conditions unless required to do so by plain, unambiguous language." *Southland Corp. v. Emerald Oil Co.*, 789 F.2d 1441, 1444 (9th Cir. 1986). Further, as this Court has previously held, lateness of the SPC's compliance documents generally would not, in itself, constitute a material breach of the indenture agreement. *In re MedCap* (Dkt. 143), at 11. Wells Fargo submitted testimony by its corporate trust expert, Mr. Hillcoat, that late delivery of compliance items is common in the industry, trustees would not refuse to honor a disbursement because a compliance item was not timely delivered, and that in his opinion Wells Fargo properly disbursed funds for administrative fees while NCCR Reports were outstanding. Hillcoat Decl. Ex. 1, at 7; Ex. 2, at 3. Based on the evidence before the Court, the fact that conditions precedent as disfavored, and the absence of clear language to create a condition, the NCCR Reports are not a condition precedent as a matter of law.

The Court DENIES the Noteholders' Motion for Partial Summary Judgment regarding disbursements for administrative fees made while NCCR Reports were outstanding, and GRANTS Wells Fargo's Motion with respect to these same breaches.

### e. Medical Capital's Alleged Breaches of the NISAs

The second category of issues on which the Noteholders move for partial summary judgment involves actions by Medical Capital and the SPCs as to which the Noteholders seek a ruling that such actions breached the indenture agreements. *See* Pls.' Mot. 14. The Noteholders

seek to establish the SPCs' breaches in order to later show that these breaches triggered certain duties under Article VI of the NISAs which Wells Fargo failed to perform. NH Pls.' Reply 14-15.

As noted previously in the discussion of Wells Fargo's Motion for Summary Judgment, applicable provisions of Section 6.01 of each NISA state that the following occurrences constitute an "Event of Default" under the respective agreements:

- any certificate or determination of Debtor furnished hereunder or in connection with the Notes . . .was false or misleading as of the date made in any material respect, and which within 30 days of notice by the Trustee, the Debtor fails to cure such inaccuracy;

- Debtor materially breaches any other covenant or provision of this Note Agreement with respect to the Notes ... and such breach continues unremedied for a period of 30 days after receipt of notice from a Noteholder or the Trustee, and in the case of a notice from a Noteholder, the Debtor shall provide a copy of such notice to the Trustee pursuant to Section 6.08.

Once an Event of Default occurs and the Trustee has notice, certain duties on the part of the Trustee are triggered. Section 6.02 establishes the prerequisites for "notice." In order to be deemed to have notice of the Event of Default, the Trustee must have "actual knowledge" or have received written notice to the same extent as required in Section 6.05. Section 6.05 further details the notice required, providing that an Event of Default is known to the Trustee "only when actual knowledge of such Event of Default is obtained by any officer within the Corporate Trust Department of the Trustee responsible for the administration of this Agreement and the trust created hereby." The various actions by the SPCs the Noteholders claim rose to the level of material breach are addressed in the following sections.

-40-

### i.      Late Submission of Compliance Documents

The Noteholders allege that the SPCs' untimely submission of periodic compliance documents was a material breach under the NISAs. Wells Fargo admits that compliance documents were chronically untimely, but argues that the untimeliness was not a material breach. Pls.' Mot. SUF 64; WF's Opp'n 15–17. The argument below tracks the same result as in Wells Fargo's Motion: lateness alone is not a per se breach, but a jury could determine that at some point the Trustee could no longer expect to receive the document, and that absence could be material.

The Noteholders set forth various documents the SPCs were required to submit on a periodic basis and which were often submitted days or months late. These documents included Quarterly Collateral Schedules and Accompanying Certifications, Monthly NCCR Reports, Annual Collateral Valuation Certifications, Debtor Compliance Certifications, and Servicer Compliance Certifications. *See* Pls.' Mot. 14–20.

This Court has made clear by its prior orders that mere tardiness in submission of compliance documents does not constitute a material breach of the NISAs. *See In re MedCap* (Dkt. 143), at 11. A material breach is one that goes to the essence of the agreement, threatening the aggrieved party with the prospect of being deprived of the benefit of the contract. Restatement (Second) of Contracts Section 241. Untimely submission of compliance documents did not "go to the essence of" the NISAs such that it would deprive the Noteholders of the benefit of the agreement. The only authority the Noteholders provide in support of their argument that timely submission went to the essence of the contract, *Gold Mining and Water Company v. Swinerton*, 23 Cal. 2d 19 (1943), nicely illustrates why their argument fails in the

context of the indenture agreements at issue here. *Gold Mining and Water Company* involved a mineral lease agreement entered into in September 1937, by which the defendants were given the right to mine minerals from the plaintiff's land in exchange for a monthly royalty payment to plaintiff based on a percentage of the gross value of the minerals extracted from the property. *Id.* at 24. The agreement contained provisions obligating the defendants to enter into immediate possession of the property, to install equipment and commence mining within a certain time, to work a minimum of 300,000 cubic yards of gravel per year, and to not cease mining operations for more than a period of 90 days. *Id.* The agreement contained a "time is of the essence" clause, expressly declaring that "[t]ime and specific performance is of the essence of this Lease Agreement." *Id.* at 27. The defendants failed to take possession and commence mining operations within the 1937–1938 mining season, and the plaintiff brought a breach of contract action. The California Supreme Court held that the defendants' failure to timely take possession and start mining was a material breach of the agreement because the object of the lease was to have mining operations commence as soon as possible and that advantage be taken of the 1937–1938 mining season. *Id.* at 26-27. The plaintiff's benefit of the agreement was to be royalties paid on the amount of material mined; clearly, the defendants' failure to begin mining deprived plaintiff of the benefit of the contract. Further, the court relied on the fact that the agreement contained specific language expressly making time the essence of the agreement. *Id.* at 27. Here, time was not of the essence of the indenture agreements such that mere late submission of the compliance documents would constitute a material breach. Unlike principal and interest payments, which were arguably the main benefits to the Noteholders and were specifically enumerated as an obligation on which default would trigger an Event of Default, the provisions

-42-

setting specific deadlines for compliance documents were more akin to "nuts and bolts" details within the complex structure of the agreement, and failure to timely submit the documents did not "go to the essence of" the contract.

The evidence submitted by the Noteholders does not change this conclusion. First, the cited deposition testimony merely shows that Wells Fargo employees would consider it a material breach if there was a complete failure to deliver compliance items on the part of the SPCs. *See* NH Pls.' Reply 15-16. Noteholders cite, for instance, Ms. Zimmerman's deposition testimony that "[a] material breach would be the nondelivery of compliance items." Pls.' Mot.15. "Nondelivery" of compliance items is clearly not the same thing as "untimely delivery" of compliance items though, as discussed in the rulings on Wells Fargo's Motion for Summary Judgment, a jury might find at some point that the document crosses the line from untimely to not-delivered. The Noteholders also cite a letter Wells Fargo sent to Medical Capital, in which Wells Fargo enumerated outstanding compliance items and notified Medical Capital that it was in material breach of the indenture agreements and an Event of Default would be declared in thirty days if Medical Capital did not cure. *See* Pls.' Mot. SUF 65. First, the Noteholders' assertion that Wells Fargo told the SPCs that they were in material breach based on compliance items that were merely nine days late is simply not supported by the evidence. The letter sent by Wells Fargo listed a number of outstanding compliance items including presumably the most recent, which was only nine days late, but the bulk of which were over two months late and some as late as five months. *See* Furukawa Decl. Ex. 21. A more likely interpretation of this letter is that Wells Fargo was warning of a material breach based on the number of outstanding compliance items combined with the length of time the items were tardy. Second, and more

important, material breach is a legal determination, and one party's statement that the other is in material breach does not make it so, especially where, as here, that party is an indentured trustee attempting to rein in a non-compliant debtor and obtain proper documentation in furtherance of the purpose of the indenture agreement.

The Noteholders have not met their burden of proving that the untimely submission of compliance items was a material breach of the indenture agreements as a matter of law. Accordingly, the Court DENIES the Noteholders' Motion for Partial Summary Judgment to the extent that it seeks relief on those grounds.

### ii.    Failure to Submit Transaction Documents

The second category of Medical Capital's alleged breaches concerns its requests for the purchase of non-receivable assets and its requests for the purchase of receivable assets, which the Noteholders assert contained materially false or misleading statements within the meaning of Section 6.01 because representations were made in the requests that certain documents had been provided to Wells Fargo when in fact they had not.

Regarding Medical Capital's requests for the purchase of non-receivable assets, the Noteholders claim that Medical Capital committed material breaches of the indenture agreements each time it submitted requests without the documentation discussed above in Section IV.c.i–iii. Specifically, the Noteholders argue that the requests were missing value and lien priority certifications, opinions of counsel, and purchase documents. The Court finds that the same reasons for denying the Noteholders' motion with respect to breaches by Wells Fargo apply here with equal if not greater force. For instance, the representation in Exhibit A-2 that the Noteholders claim was false and misleading with respect to opinions of counsel reads "You

[Wells Fargo] have been previously, or are herewith, provided with . . . an opinion from counsel in form and substance reasonably acceptable to the Trustee to the effect that the Trustee will have a perfected security interest in the Acquired assets upon their acquisition from the Debtor." MP III.1 NISA, Exhibit A-2. In light of the fact that Wells Fargo had been previously provided opinions of counsel for the assets in question, albeit in connection with the prior series of notes, and Wells Fargo found these opinions acceptable, there is, at the very least, a genuine dispute as to whether this statement was materially false or misleading. The Court finds the Noteholders failed to show that the absence of such documentation made these statements materially false or misleading as a matter of law.

The Noteholders also argue that Medical Capital submitted materially false or misleading statements in its requests to purchase receivable assets based on its omission of Purchase Documents. Given that the Court found it was a jury question whether Wells Fargo negligently breached with respect to this condition precedent, it follows that these statements were not, as a matter of law, materially false or misleading for the purpose of declaring an Event of Default under Section 6.01.

Accordingly, the Court DENIES the Noteholders' Motion for Partial Summary Judgment with respect to finding breach by Medical Capital for statements in its requests for the purchase of receivable and non-receivable assets.

### iii.    Submitting Non-Conforming Administrative Fee Requests

The Noteholders argue that Medical Capital materially breached the indenture agreements on multiple occasions when it submitted administrative fee requests. Specifically, they claim a material breach occurred: (1) the nine instances in which an administrative fee

request was submitted with a blank NCCR figure; (2) each time an administrative fee request was submitted when a NCCR Report for the prior month had not yet been submitted; (3) each time an administrative fee request was submitted with a certification that did not include the language that the NCCR was satisfied "after giving effect to the requested disbursement"; (4) each time that an administrative fee request was submitted and the SPC had outstanding compliance items due; and (5) each time an administrative fee request was submitted with an identical NCCR percentage.

(1) <u>Blank NCCR Figures</u>

As discussed above, Wells Fargo has conceded that the nine administrative fee requests with blank NCCR figures breached the indenture agreements. Wells Fargo argues that it had no duty under the indenture agreements to investigate or verify the NCCR figure it was provided and therefore the important part of the form was the certification that the collateral coverage requirement was met. In addition, these requests represented only 9 out of 300 total fee requests processed by Wells Fargo. As far as substantive arguments, however, Wells Fargo relies solely on the causation argument set forth in its own motion for partial summary judgment. The Court rejects that argument, as detailed above in the discussion of Wells Fargo's Motion. Given the importance of the NCCR figure, Medical Capital's complete failure to provide the NCCR on those nine occasions constituted a material breach. Although the Court finds material breach on the part of Medical Capital, this ruling, of course, does not determine breach or liability against Wells Fargo under the indenture agreements.

(2) <u>Outstanding NCCR Reports</u>

-46-

The Noteholders argue that each time the SPCs submitted administrative fee requests when the prior month's NCCR Report had not yet been submitted they materially breached the NISAs. As discussed above, the NISAs contain no express requirement that the NCCR Report be submitted prior to submission of an administrative fee request. For the same reasons discussed above, a genuine dispute exists regarding whether this conduct materially breached the indenture agreements.

### (3) Absence of "After Giving Effect to the Requested Disbursement"

The Noteholders argue that Medical Capital materially breached the indenture agreements each time it submitted an administrative fee request because the fee request form did not contain the language that the NCCR was satisfied "after giving effect to the requested disbursement[,]" which the Noteholders claim was required by Section 3.05(h).

The provision in question required Medical Capital to provide with administrative fee requests:

> [A] certification to the Trustee with its request, to the effect that the Collateral Coverage Requirement is satisfied (after giving effect to the requested disbursement) on the basis of the Net Collateral Coverage Ratio calculated and provided by the Debtor to the Trustee as of the last day of the month preceding the month in which such request is made.

NISA Section 3.05(h). The form used for administrative fee requests contained the following certifications: "The Debtor is not, on the date hereof, in default under the Agreement or in the performance of any of its covenants and obligations, and; The Net Collateral Coverage ratio is []% or []:1 and there is no Collateral Coverage Default in accordance with the terms and scope

of the Agreement." Furukawa Decl. Ex. 35.[27] Wells Fargo correctly points out that "Collateral Coverage Default" is a defined term in the NISAs, meaning "a determination by the Debtor, certified to the Trustee, that the Net Collateral Coverage Ratio does not meet or exceed the Collateral Coverage Requirement." *See* MP III NISA 2. Under the terms of the NISAs, therefore, a certification that "there is no Collateral Coverage Default" has the same meaning as would a certification that the "Collateral Coverage Requirement is satisfied." This clearly fulfilled the language required by the NISAs. Whether the form satisfied the requirement that the certification state that the collateral coverage ratio is satisfied "(after giving effect to the requested disbursement)" is a closer question. The form does not explicitly contain that language. By the terms of the NISAs, however, strict compliance was not required. The NISAs merely required a "certification to the effect that the Collateral Coverage Requirement is satisfied (after giving effect to the requested disbursement) . . . ." The fact that the "after giving effect to..." language was placed in parentheses also suggests that it was intended to be an implicit requirement rather than language explicitly stated in the certification. Moreover, the certification did state that there is no collateral coverage default "in accordance with the terms and scope of the Agreement"—one such term being that the coverage requirement is satisfied after giving effect to the requested disbursement.

Given the above evidence regarding the language of the certification and the requirements of the agreements, a genuine dispute exists as to whether the SPCs' use of an

---

[27] The Court notes that the very first administrative fee request from MP III, which page 1 of Exhibit 35 to the Furukawa Declaration, contained somewhat different language because the ongoing NCCR percentage could not yet be calculated.

administrative fee request form that did not explicitly contain the language "after giving effect to the requested disbursement" was a material breach of the indenture agreements.

### (4) Late Compliance Documents

The Noteholders argue that because the administrative fee requests contained a statement that the SPC "is not, on the date hereof, in default under the Agreement or in the performance of any of its covenants and obligations," and the SPCs were in default from late compliance documents, the above statement was materially false or misleading. Given the Court's ruling that a genuine dispute exists as to the materiality of untimely submission of compliance documents, the question of whether the SPCs submitted materially false statements regarding their non-default as to submission of compliance documents is necessarily subject to a genuine dispute as well.

### (5) Constant NCCR Figures

The Noteholders argue that MP V submitted multiple administrative fee requests with the identical NCCR of 103.86% and it was impossible for the NCCR to remain constant over multiple requests; therefore, at least some of the fee requests must have contained false NCCRs. The evidence the Noteholders submit in support of this proposition is an email from Ms. Zimmerman to Medical Capital in which she inquires about the constant ratio and makes the statement that "[i]t would seem that the Net Collateral Coverage Ratio of 103.86% would not remain the same on a day to day basis with the daily changes in your total cash/receivables and total liabilities positions." Pls.' Mot. SUF 45. This email can be seen as merely evidence that Ms. Zimmerman questioned whether the NCCR could be the same and made an inquiry to Medical Capital for an explanation. As explained above, Wells Fargo has presented evidence that there may in fact have been an explanation for at least some of the identical NCCRs. The evidence submitted by the Noteholders is not sufficient to show beyond a genuine dispute that

identical NCCRs was an impossibility such that the fee requests must have contained false statements.

For the foregoing reasons, the Noteholders' Motion for Partial Summary Judgment is GRANTED with respect to the narrow issue of Medical Capital's material breach of the MP V NISA by failing to state an NCCR figure on the nine occasions, as described and with the limitations stated above, and DENIED with respect to the remaining grounds on which breach of the indenture agreements by Medical Capital is premised.

## V.    Wells Fargo's Objection to Plaintiffs' Expert

As the Court discussed at the hearing on these Motions, it is not inclined at this stage to strike the expert report of Stewart Sterk, a professor at Cardozo Law School whom Plaintiffs retained. Plaintiffs have not challenged Wells Fargo's expert, Christopher Hillcoat. The Court made clear to the parties that narrowly tailored Motions in Limine, or specific objections, are the appropriate way to handle concerns at trial about an expert impermissibly instructing jurors as to the law, and the parties may challenge the persuasiveness of his views in cross-examination. Sterk may not have Hillcoat's specific experience in indenture trustee administration, but Federal Rule of Evidence 702 is not so narrow as to only allow those with specific working experience in the field. *See* F.R.E. 702 (noting an expert can qualify by "knowledge" or "education," if, among other things, his "specialized knowledge will help the trier of fact to understand the evidence").

## VI. Disposition

For the foregoing reasons, the Court DENIES in part Wells Fargo's Motion For Summary Judgment and GRANTS the Motion in part.  Plaintiffs' Motion For Summary Judgment is DENIED in part and GRANTED in part.

DATED:  April 2, 2013            _____
                                        DAVID O. CARTER
                                UNITED STATES DISTRICT JUDGE